**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JASON FERGUSON and PAUL TEITLER, individually and on behalf of all others similarly situated, | **Case No.** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CBD AMERICAN SHAMAN, LLC, and STEPHEN VINCE SANDERS II | |
| Defendants. | |

## INTRODUCTION

1.      This is a case about a business that profits from addiction the same way the Sackler family once did.

2.      Defendants are the inventors, manufacturers, and sellers of a new, unapproved, psychoactive drug called 7-Hydroxymitragynine, or "7-OH" for short, which is sold under the brand "Advanced Alkaloids." The product is sold at hundreds of stores, including CBD American Shaman stores, across the United States, as well as online.

3.      Defendants profess that 7-OH is a benign alternative to kratom that provides a wide array of mental and social benefits such as "enhanced relaxation" and "focus."

4.      What Defendants do not disclose is that 7-OH is an unapproved drug that is ten times more powerful than morphine in activating the mu-opioid receptor, which is associated with opioid addiction.

5.      Defendants intentionally formulated 7-OH to be extremely physically and psychologically addictive. As a result, it has high potential for abuse.

6.      The addictive nature of the product has, predictably, caused sales to go through the roof. The CEO of CBD American Shaman, a former convict who went to prison for drug dealing, told a journalist that even though the product was unheard of before, "tens of millions" of 7-OH were sold when it first hit the market in early 2024. The launch of the product was the biggest success the company has ever had.

7.      This is a class action seeking an injunction shutting down sales of 7-OH, a full refund to class members of all money spent on the product, and/or disgorgement of

the substantial profits that Defendants have generated from the sale of the product.

## PARTIES

8.      Plaintiff Jason Ferguson is domiciled in Santa Cruz, California and purchased the subject product in 2024 while in California.  This plaintiff is referred to as a "California Plaintiff" in this complaint.

9.      Plaintiff Paul Teitler is domiciled in Forest Hills, New York, but purchased the subject product in 2024 while in Pennsylvania.  This plaintiff is therefore referred to as a "Pennsylvania Plaintiff" in this complaint.

10.     Plaintiffs would not have purchased the subject product if they had known it was illegal to sell, or that it was extremely physically and psychologically addictive with a high potential for abuse.

11.     Each Plaintiff reviewed the labeling at the time of purchase, and neither of the aforementioned facts regarding illegality or the extreme risk of addiction were disclosed.

12.     Plaintiffs have no past or present financial, employment, familial, or other relationship with any of the attorneys in this action that would create a conflict of interest with the proposed class members.

13.     As a result of the addictive nature of the product, each Plaintiff is at risk of purchasing the product again.  Therefore, an injunction would benefit Plaintiffs in the future by removing from the market a product that is highly likely to trigger addictive behaviors.

14.     In addition, each Plaintiff remains interested in purchasing alternatives to

2

kratom, like the subject product, that may provide the advertised mental benefits, but they are concerned that Defendants would again sell the subject product with a formulation that is illegal and highly addictive. An injunction requiring Defendant to either take remedial steps or withdraw the product from the market would therefore benefit Plaintiffs.

15.     Defendant CBD American Shaman LLC ("American Shaman"), is a Missouri company with its principal place of business in Kansas City, Missouri. Defendant manufactures, distributes, advertises, and sells the subject product.

16.     Defendant Steven Vincent Sanders, II is the CEO of American Shaman and is domiciled in Missouri. Mr. Sanders is not only the public face of American Shaman, but he also micromanages and has final say over the distribution, manufacturing and marketing of 7-OH, including the labeling.

17.     Mr. Sanders supervised and directed the work of American Shaman's lead chemist Jade Mitchell to ensure that the product was formulated to maximize its addictive qualities.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed class, have a different state citizenship from Defendants

3

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendants' principal place of business is in this District. Defendants' decisions concerning the formulation, marketing, labeling, and sale of the products at issue originated in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      7-OH Products Are Highly Addictive**

20.     The subject product at issue in this case is CBD American Shaman 7-OH Chewable Tablets ("7-OH").

21.     The 7-OH products marketed and distributed by Defendants are produced by extracting and synthesizing the 7-OH alkaloid from a tropical plant known as the kratom plant.

22.     Defendants' 7-OH products differ from many other kratom products on the market. Unlike raw kratom where 7-OH generally makes up less than 1% of kratom powder by weight, the extraction and synthesis of 7-OH from raw kratom creates an even more highly concentrated and potent product.

23.     This extracted, synthesized and concentrated product is a psychoactive drug. But it is not approved by the FDA, as it must be. Thus, any marketing and distribution of this drug is illegal, regardless of the debilitating effects of the drug. And the effects are indeed debilitating.

4

24.     Studies have shown that, when 7-OH is administered in concentrated doses, like in the products at issue, 7-OH presents a significant risk of inducing addiction. Yet, consumers are largely unaware of this fact.

25.     Like opioid products, consumption of these 7-OH products creates a great risk of addiction, dependency, and painful withdrawal symptoms, among other negative effects. 7-OH is ten times more powerful than morphine in activating the mu-opioid receptor, which is associated with opioid addiction.

26.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug. Users want to stop but cannot.

27.     Substances that act on the opioid receptors, like Defendants' 7-OH products, have a high risk of addiction. Addiction occurs when the user develops a tolerance to the product that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had. As these doses increase, the body becomes dependent on the drug to feel normal and function properly. When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs. Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

28.     7-OH withdrawal symptoms are similar to those of traditional opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and

bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

29.     Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal. Use is no longer about getting high, but about not feeling "sick."

30.     Consumers have communicated that, when they first began taking the 7-OH products, they were largely unaware of the significant, adverse effects and addictive properties of 7-OH products.  When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine.  They do not think that 7-OH products sold at CBD American Shaman stores or other local stores will act like an opioid with the same, if not greater, addiction and dependency risks as opioids.  As a result, many unsuspecting consumers have developed, or are at extreme risk of developing, 7-OH dependencies that can cause them serious physical, psychological, and financial harm.

31.     Consistent among the reports of addiction from 7-OH products is a feeling of initial shock when users realized they had become unknowingly addicted and how difficult it was to stop their 7-OH use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of September 2024, where users complained about their addiction to synthesized kratom extracts:

    i.     One user wrote: I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it

every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

ii.    Another user shared: I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

iii. Another user shared: I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly… Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

32. This Internet forum is filled with other accounts like these, and the stories echo each other – well-meaning people were looking to feel better by taking with what they thought was an herbal supplement, only to develop an opioid-like addiction. This evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.

33. Addiction is a disease. In making consumers addicted to their 7-OH products, Defendants have created an unreasonable health hazard. At a minimum, Defendants had a duty to disclose this fact on the packaging of their products.

## II.     Defendants Marketed The 7-Oh Products In A Deceptive Manner

34.     Defendants have marketed their 7-OH products by touting its benefits,

without sufficient regard to the serious dangers posed by the products.

35.     Defendants' website touts the benefits of the 7-OH product as including:

- Enhanced Relaxation
- Focus
- Energy Motivation
- Mood Elevation
- Body Buzz
- Euphoria
- Discomfort Suppression
- Apprehension Relief
- Feeling Present
- Stimulation
- Arousal
- Social Lubrication

36.     But Defendants fail to disclose that this unapproved drug has the same, if

not higher, potential for addiction as opioid, should not be taken on a daily basis, will

result in opioid-like dependency when taken regularly, and will cause adverse effects

upon withdrawal.

37.     Instead of disclosing the significant, adverse effects of using 7-OH

products, Defendants' website touts the "day after" effect as just positive – "[n]o

hangovers, enhanced feelings, and awareness the next day."

38.     Defendants' website claims that, compared to other alkaloids in the kratom

plant (*i.e.*, mitgragynine), the 7-OH alkaloid "requires smaller amounts for the same

effects, reducing the potential for unwanted reactions."  Thus, Defendants admit that their

7-OH products contain the more potent kratom alkaloid (7-OH), instead of the less potent

alkaloid (mitragynine), but Defendants fail to disclose on their packaging that heightened harm corresponds with the increased potency of their concentrated 7-OH products.

39. Defendants also fail to disclose the numerous side effects and withdrawal symptoms caused by their 7-OH products, including irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

40. Defendants' website goes on to market the 7-OH products as containing "naturally occurring compounds" for those "seeking natural relief." The "natural" reference misleads the consumer. 7-OH does not appear in nature in the isolated, concentrated and synthesized form found in the 7-OH products at issue.

41. Defendants' website further suggests that the manufacturing process of the product is "safe" and "isolate[s] the most beneficial alkaloids," thereby suggesting that 7-OH itself is the safe part of the kratom plant. Emphasizing that point, the website goes on to claim, in a misleading manner, that these manufacturing processes "minimize negative side effects by using only the most effective parts of the [kratom] plant and providing an isolated alkaloid instead of all parts, constituents and compounds of the plant." It is the "most effective parts" of the kratom plant, which Defendants acknowledge using, that creates the most potency and thus the highest potential for addiction.

42. Defendants' website suggests that the product is legal, if not approved. The website proclaims that "Mitragynine is legal in every state except" several states. But the

7-OH products at issue are not products containing mitragynine. The products contain a different alkaloid (7-OH), and the isolated, concentrated and synthesized form of the 7-OH is an unapproved drug. At no point do Defendants ever warn that their product is an unapproved drug.

43. Wholly ignoring the great addictive potential and horrific effects of an unapproved drug, Defendants attempt to play a game of gotcha with their users. Defendants' website improperly and ineffectively tries to foist all "responsibility for any adverse events or health complications that may arise" on consumers and disclaims any "liability for the use or misuse of this product." In attempting to avoid all liability and make the consumer responsible for Defendants' own obligations, this disclaimer only reflects Defendants' awareness of liability for the dangerous product they have placed in the stream of commerce, all without adequate warnings.

44. Further ignoring the harmful effects of the product, including the great potential for addiction, Defendants weakly argue in their "disclaimer" that, "[a]lthough there aren't studies conclusively showing addiction related to alkaloids, there are anecdotal reports of people developing an addiction to alkaloid products." Defendants go on to put the onus on the consumer by demanding that "[i]f you feel you are developing an addiction to this or any product, consult a physician or an addiction center immediately." These watered-down warnings ignore all the harmful effects of an unapproved drug, including the great potential for addiction. They are plainly insufficient. This is a product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

45.     As a direct and proximate result of Defendants' failure to warn of the numerous material facts identified above, many 7-OH users find themselves blindsided by the adverse effects from what unsuspecting users thought was a harmless supplement, especially when they stop taking 7-OH and find themselves facing severe withdrawal symptoms.

46.     Consumers who knew the full truth about 7-OH would not have purchased Defendants' 7-OH products or would have paid less than they did for them.

47.     To make matters worse, Defendants have given 7-OH products out as free samples, with zero warning that the product is substantially more addictive than kratom or that continued use may result in severe withdrawal symptoms.  The very act of giving out "free samples" signals to consumers that the product is safe and harmless.  Without adequate warnings, consumers have no reason not to try the sample.  They may even enjoy the effects and continue using the product because they do not believe anything with such substantial addictive potential would not bear some kind of warning.

48.     Reasonable consumers looking at the packaging and online store description would not presume that 7-OH is highly addictive.  Nowhere on the packaging do Defendants mention that 7-OH presents the same addiction problems that former opioid users and any other consumers would want to avoid.  Consumers seeking help as they come off opioids can be drawn in by Defendants' misleading statements about 7-OH without knowing that they risk trading one addiction for another addiction (if not a worse addiction).

### III. Defendants Knew Or Should Have Known They Were Selling A Highly Addictive Drug

49.     As a 7-OH product marketer, manufacturer and distributor, Defendants occupy a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH.

50.     Defendants manufacture their 7-OH products in a specialized lab using highly technical knowledge about kratom alkaloids to extract and synthesize the 7-OH in their products.  These sophisticated Defendants were and are aware of the addiction risks posed by their Products.

51.     Indeed, the pharmacological effects of 7-OH have been well-studied, and it is well-established that 7-OH acts on the same mu-opioid receptors in the brain as traditional opioids do, resulting in addictive effects.  This has not gone unnoticed by Defendants, whose own website acknowledges that 7-OH "interacts with the brain's opioid receptors, particularly the mu-opioid receptor, resulting in mood enhancement and discomfort relief."

52.     Further, there are widespread reports and studies of other addiction and dependency issues.

53.     Therefore, Defendants knew, and have intentionally designed their 7-OH products, to prey on users and the great potential for getting addicted to the 7-OH products.  At a minimum, Defendants should have known of this great potential.

54. Nevertheless, Defendants market their 7-OH products as if they are nothing more than over-the-counter supplements, with packaging appearing as an analgesic or allergy medication, not a dangerous drug.

42. Defendants failed to disclose 7-OH's addictive potential because Defendants knew or should have known that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions to Defendants' financial detriment.

43. Defendants' conduct is immoral, unethical, and contrary to public policy. The United States has gone through an opiate crisis. Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosure of the risks and the use of false and misleading packaging and marketing. That cannot– and should not–stand, at least when Defendants' conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

44. Lest there be any doubt about Defendants' tortious intent, one of Defendants' ringleaders, Defendant Stephen Vincent ("Vince") Sanders II, is a convicted felon and drug dealer who has been involved in the distribution and manufacture of other dangerous products, including "Neptune's Fix" that the FDA issued warnings about and was the subject of a nationwide recall.

## <u>CLASS ALLEGATIONS</u>

45. **Class Definition:** Plaintiff seeks to represent the following classes:

<u>Nationwide Class</u>: all people in the United States who purchased the subject product within the applicable statute of limitations.

Multi-state Consumer Protection Class: all people who purchased the subject product (1) in the states of Michigan, Minnesota, or New Jersey within the applicable statute of limitations; (2) in the state Missouri within the applicable statute of limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the applicable statute of limitations; (4) in the states of Illinois and New York within the applicable statute of limitations.

California Class: all people in California who purchased the subject product within the applicable statute of limitations.

Pennsylvania Class: all people in Pennsylvania who purchased the subject product within the applicable statute of limitations.

46.     Pursuant to Fed. Civ. P. 23(c)(1)(C), each of the above class definitions is a placeholder that may be altered or amended at any time before final judgment. Subject to additional information obtained through further investigation or discovery, the above-described Classes may be modified or narrowed as appropriate, including with the use of multi-state subclasses to account for material variations in state law, if any.

47.     Excluded from the putative classes are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family. Also excluded are any claims for personal injury.

48.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, the number of putative class members is believed to be so numerous that joinder of all members is impractical, and at least higher than 40.

49.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in

this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      a.  Whether Defendants knew or should have known that the subject product is dangerously addictive;

      b.  Whether the dangerously addictive nature of the subject product would be material to a reasonable person;

      c.  Whether Defendants failed to disclose and concealed the dangerous nature of the subject product;

      d.  Whether Defendants' conduct, as alleged herein, violates the consumer protection laws asserted here.

50. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Classes sustained damages as a result of Defendants' uniform wrongful conduct.

51. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel that are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that are antagonistic to those of the Class.

48. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as

a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code, §§ 17200, et seq.**

49.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

50.     The California Plaintiff brings this cause of action individually and on behalf of all members of the California and Multi-State Consumer Protection Classes.

51.     To the extent required by law, this cause of action is alleged in the alternative to legal claims.

52.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"

53.     A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and other similarly situated who are affected by unlawful and/or unfair business practices or acts.

54.     Defendants have committed unlawful, fraudulent, and/or unfair business practices under the UCL  by selling addictive substances to unsuspecting consumers and profiting from their addiction, all while failing to disclose that their 7-OH Products pose a serious risk of addiction and are a drug that has not been approved by the FDA, as they must be.

55.     Defendants' conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

56.     Defendants' conduct has injured the California Plaintiff and the classes he seeks to represent in that they paid money for a subject product that they would not have purchased or paid more than they would have but for Defendants' failure to disclose the addictive nature of their 7-OH Products.  Such injury is substantial and is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from Defendants' conduct.  Since consumers reasonably rely on Defendants' labels, and thus also Defendants' omissions, consumers themselves could not have reasonably avoided such injury.

57.     Defendants' Products pose an unreasonable health hazard because 7-OH is highly addictive and may induce serious withdrawal symptoms.  Accordingly, Defendants had a duty to consumers to disclose on the Products' labels that their 7-OH Products pose a risk of physical and psychological dependence.

58.     Defendant's conduct also violates the "unlawful" product of the UCL, because the product is a drug without FDA approval and adulterated under 21 U.S.C.

§ 350(b), for multiple reasons.  First, the subject products contain chemically altered, non-food ingredients.  Second, there is no history of use or other evidence of safety establishing that 7-OH when used under the conditions recommended or suggested in the product labeling will be reasonably expected to be safe.  Third, Defendants did not provide requisite information concerning the safety of the product to the federal government at least 75 days before introducing 7-OH into interstate commerce.

59.     <u>No Adequate Remedy At Law</u>:  Plaintiff and members of the Class are entitled to equitable relief because no adequate remedy at law exists.

(a)     Legal remedies are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.

(b)     Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiff fail to sufficiently adduce evidence to support an award of damages.

(c)     Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Plaintiff seeks non-restitutionary disgorgement of profits in connection with his unjust enrichment claim.

(d)     Legal claims for damages are not equally certain as restitution because equitable claims entail few elements.

19

(e)     Significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

60.     Plaintiff seeks all relief available under this statutory cause of action.

## COUNT II
### Violation of California's False Advertising Law ("FAL")
### Business and Professions Code, §§ 17500, et seq.

61.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

62.     The California Plaintiff brings this cause of action individually and on behalf of all members of the California Class.

63.     To the extent required by law, this cause of action is alleged in the alternative to legal claims.

64.     Defendants' acts and practices, as described herein, have deceived, and are likely to continue to deceive, California Class members and the public at large.  As described above and throughout this Complaint, Defendants failed to disclose that 7-OH is addictive on their Products' packaging.

65.     Defendants disseminated uniform advertising regarding the subject products to and across California.  This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the FAL. Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

66.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive because Defendants

continue to engage in the misrepresentations, omissions, and partial representations alleged in this complaint.

67.     Defendants knew, or should have known, that in making and disseminating these statements, their advertisements were untrue and misleading in violation of California law. Defendants know that 7-OH is addictive yet fail to disclose this fact to consumers.

68.     The California Plaintiff and California class members lack an adequate remedy at law for the same reason alleged above.

69.     Plaintiff seeks all relief available under this statutory cause of action.

<u>**COUNT III**</u>
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Cal. Civil Code, § 1750, et seq.**

70.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

71.     The California Plaintiff brings this cause of action individually and on behalf of all members of the California Class.

72.     Civil Code Section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

73.     Civil Code Section 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

74.     Defendants violated Civil Code Sections 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its 7-OH Tablets are addictive, an unreasonable health hazard and necessarily a fact which is material to reasonable consumers.

75.     Defendants' misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

76.     Defendants have exclusive or superior knowledge of 7-OH's addictive nature, which was not known to Plaintiffs or California Class members.

77.     Plaintiffs and California Class members have suffered harm as a result of these violations of the CLRA, Civil Code Section 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that 7-OH is addictive and causes withdrawals.

78.     With respect to injunctive relief and restitution available under this statute, Plaintiff lacks and adequate remedy at law for the same reasons alleged above.

79.     On January 14, 2025, Plaintiffs' counsel sent Defendants a CLRA notice letter, which complies in all respect with Section 1782(a).  The letter was sent via certified mail, return receipt requested, and advised Defendants that they were in violation of the CLRA and demanded Defendants cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.  The letter also provided pre-suit notice under all other statutory consumer protection laws, warranty laws, and all other state or federal laws requiring pre-suit notice.

80. The California Plaintiff seeks all relief available under this statutory cause of action, except for damages. Plaintiff will amend the complaint to include damages under this cause of action after expiration of the statutory notice period.

## COUNT IV
### Violation of the Pennsylvania Trade Practices and Consumer Protection Law
### 73 Pa. Cons. Stat. §§ 201-1, et seq.

81. Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

82. The Pennsylvania Plaintiff brings this cause of action individually and on behalf of all members of the Pennsylvania Class.

83. Defendants' practices, acts, policies and course of conduct, as described above, constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical, oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of the Pennsylvania Trade Practices and Consumer Protection Law ("UTPCPL"). Defendants concealed, suppressed and omitted to the Pennsylvania Plaintiff and the other Class members at the time of purchase or lease, that subject products were dangerously addictive and illegal to sell.

84. Defendants' misrepresentations, concealment and omissions were material.

85. Defendants' conduct occurred in the course of conduct involving trade or commerce. Defendants' conduct caused the Pennsylvania Plaintiff and the other Pennsylvania Class members to suffer ascertainable losses of money and property in that they were misled into purchasing the subject products after having been misled about the addictive and unlawful nature of the product.

23

86.     The Pennsylvania Plaintiff seeks all available relief under this cause of

action.

### COUNT V
### Breach of Implied Warranty

87.     Plaintiffs incorporate and reallege each preceding paragraph as though fully

set forth herein.

88.     Plaintiffs bring this cause of action individually and on behalf their

respective state subclasses and provisionally on behalf of the nationwide class.  Each

Plaintiff alleges this cause of action under their respective state laws.

89.     Defendants, as the designers, manufacturers, marketers, distributors, and/or

sellers of the Products, impliedly warranted that 7-OH is not addictive and does not cause

opioid-like withdrawal symptoms because they did not provide disclosure on the

Products' packaging stating otherwise.

90.     Defendants breached their warranty implied in the contract for the sale of

their 7-OH Products because the Products could not pass without objection in the trade

under the contract description: the 7-OH Products were not adequately contained,

packaged, and labeled as per Defendants' contract with Plaintiffs and the class members,

and the subject products do not conform to the implied affirmations of fact made on the

marketing and packaging for the Products that the Products are not addictive and do not

cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiffs and class

members did not receive the goods as impliedly warranted by Defendants to be

merchantable.

91.     Plaintiffs and class members purchased the 7-OH Tablets in reliance upon

Defendants' skill and judgement and the implied warranties of fitness for the purpose.

92.    The 7-OH Products were defective when they left Defendants' exclusive control.

93.    Plaintiffs and class members did not receive the goods as warranted.

94.    Plaintiffs are in privity with Defendants because they purchased the products either at a CBD American Shaman store or an authorized retailer acting as an agent of Defendants.

95.    Plaintiffs were the intended consumers of the subject products, not the retail stores who sold Plaintiffs the products.

96.    Alternatively, Plaintiffs are third party beneficiaries of implied warranties between Defendants and retailers.

97.    As a direct and proximate cause of Defendants' breach of their implied warranty, Plaintiffs and the Nationwide Class have been injured and harmed because (i) they would not have purchased Defendants' Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendants.

98.    Defendants were provided with pre-suit notice of this cause of action.

99.    Plaintiffs seek all relief available under this cause of action.

## COUNT VI
**Fraud**

100.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

101.    Plaintiffs bring this cause of action individually and on behalf their respective state subclasses and provisionally on behalf of the nationwide class. Each Plaintiff alleges this cause of action under their respective state laws.

102.    Defendants misrepresented that their 7-OH Products had attributes or qualities that they do not have by failing to disclose that 7-OH is addictive and can cause opioid-like withdrawal, and by failing to disclose that the products were illegal to sell.

103.    Defendants know that 7-OH is addictive because they employ a highly specialized lab to isolate and extract 7-Hydroxymitragynine from kratom, and because they have received consumer reports of addiction and withdrawal.

104.    Defendants know that knowledge of 7-OH's addictive nature is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard.

105.    Defendants therefore had a duty to Plaintiffs and to class members to disclose that 7-OH is addictive and can cause withdrawals on the Products' packaging.

106.    Consumers reasonably and justifiably relied on Defendants' omissions, because it is reasonable to assume that a product which is addictive like an opioid would bear a warning on its packaging.

107.    As a result of Defendants' omissions, Plaintiffs class members paid for 7-OH Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about 7-OH.

108.    Plaintiffs seek all available relief under this cause of action.

## Unjust Enrichment

109.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

110.     Plaintiffs bring this cause of action individually and on behalf their respective state subclasses and provisionally on behalf of the nationwide class.  Each Plaintiff alleges this cause of action under their respective state laws.

111.     To the extent required, Plaintiffs assert this cause of action in the alternative to legal claims, as permitted by Rule 8.

112.     Plaintiffs and class members conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money they paid to Defendants.

113.     Defendants knew of the benefit conferred on it by Plaintiffs and the class members.

114.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendants failed to disclose on the Products' packaging that the Products were addictive and similar to opioids.  This caused injuries to Plaintiffs and the Nationwide Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

115.     Defendants accepted and retained the benefit in the amount of the gross revenues they derived from sales of the Products to Plaintiffs and the class members.

116.    Defendants profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

117.    Plaintiffs and class members are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

118.    As a direct and proximate result of Defendants' actions, Plaintiffs and the class members have suffered in an amount to be proven at trial.

119.    Equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

120.    Defendants are not an innocent third party but instead directly benefited from the unlawful conduct alleged here.  Defendants benefit financially from its sales tactics and clearly retained financial benefits from consumers purchasing the products at issue. The relationship between Plaintiffs' and class members detriment and Defendants' benefit flows from the challenged conduct alleged in this Complaint.

121.    Putative class members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seeks a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of

Civil Procedure, naming Plaintiffs as representative of the classes, and

naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendants' conduct violates the statutes

referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts

asserted herein;

(d)    For non-restitutionary disgorgement of all profits obtained from the sale of

the subject products.

(e)    An award of statutory damages, actual damages, and/or restitution to the

extent available;

(f)    For punitive damages, as warranted, in an amount to be determined at trial;

(g)    For prejudgment interest on all amounts awarded;

(h)    For injunctive relief as pleaded or as the Court may deem proper; and

(i)    For an order awarding Plaintiffs and the Class their reasonable attorneys'

fees and expenses and costs of suit.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demands a trial by jury of all issues

so triable.

Dated: January 16, 2025                    Respectfully submitted,

_/s/ Leo B. Oppenheimer_____
OPPENHEIMER LAW, LLC
Leo B. Oppenheimer MO #75073

29

J. Broc Exposito MO #72793
3145 Broadway Blvd.
Kansas City, MO 64111
Tel: (816) 375-6408
Fax: (816) 375-6409
LOppenheimer@Oppenheimer-Law.com
BExposito@Oppenheimer-Law.com


SMITH KRIVOSHEY, PC
Joel D. Smith (pro hac vice forthcoming)
867 Boylston Street,
5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

SMITH KRIVOSHEY, PC
Yeremey O. Krivoshey
(pro hac vice forthcoming)
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com